DAUKSCH, Judge.
This is an appeal from an adjudication of delinquency after a finding that appellant committed the crime of resisting an officer without violence. § 843.02, Fla. Stat. (1995).
There are a number of reasons for the reversal of this adjudication. First, the officers had no lawful right or purpose in initially detaining appellant. Second, the evidence is insufficient to prove appellant resisted any officer in any significant, or legally sufficient manner. Third, one can resist an officer who is not lawfully performing a duty, so long as that resistance is without violence, as was charged here. Mayhue v. State, 659 So.2d 417 (Fla. 2d DCA 1995); C.K. v. State, 487 So.2d 93 (Fla. 3d DCA 1986).
The state presented two witnesses at trial, both deputies sheriff. The first witness was a sergeant with thirty-two years experience and the second was a deputy with seven years experience. The sergeant said he was called to supervise the detention of twenty to thirty persons who were corralled by four other deputies outside a nightclub. Those persons were standing against a wall with their hands upon the wall and their feet spread out. They were being frisked and questioned. No citizen complaint had initiated the deputies’ response to the scene. No warrants were to be served. No crimes had been committed. The persons were complying with the deputies’ orders when an individual across the street or some distance from the detained group began shouting and telling the group to leave, that the deputies had no right to hold them. He was telling them to run. This individual was told to be quiet and stop telling the persons to run. He persisted and was arrested. Appellant then stepped out from the detained group and started laughing and yelling derisively at this individual saying “now let’s see you run.” Appellant was arrested for inciting a riot because of stepping away from the group and yelling at the individual. The state attorney charged him with resisting an officer without violence.
The other deputy testified that
A There was no call for service there. Several other deputies and myself had observed the juveniles that were congregating in front of the nightclub were stepping out into traffic, pedestrians were having a problem traversing on the sidewalk, and so on and so forth. And any time that we have a large crowd that tends to congregate outside the nightclub, then we tend to have a problem.
So what we decided to do was to make contact with the juveniles and try to nip it in the bud.
Q Was your responsibility that night strictly to investigate the juveniles?
A Yes.
Q Is that part of your job assignment as far as being with the Orange County Sheriffs Office at this time?
A Yes, sir.
Q When you arrived, were there any other deputies at the scene?
A Yes, sir.
Q What was the situation when you arrived?
A When all of us arrived initially, what we did was to ...
Q Okay. Well, you said there were other officers there already — other deputies. A Right.
Q What was happening when you first arrived?
A Well, all of the deputies tended to arrive together.
Q Okay.
A We all arrived together and we separated them and had them line up along the building — the sidewalk to make contact with them, to identify them. We have *855 knowledge — prior knowledge in that we’ve had prior contact with several of them. That they were known to carry weapons; known to deal in drugs, so....
Q Okay. What was your — when that was going on, was that part of the standard operating procedure that you would do as far as an investigation of that type?
A Yes, sir.
Q Was it, in fact, an investigation that was going on?
A I would consider it an investigation, yes.
Q Was — what were your — after that started, what were your responsibilities?
A There were two females, two juvenile females, with the crowd. And my responsibility was to identify them, pat them down for any weapons, and see if they were or were not runaways.
* * * * * *
Q Now you say the five officers, or four or five that converged, you were not responding to a call, were you?
A That's correct.
Q So there was no report of a crime?
A Correct.
Q Did you have any specific facts of a crime that had just recently taken place that this group of people may have committed?
A No.
Q Now when these people were put up against the wall, were they free to turn around and just walk away from the wall?
A No.
Q If they’d wanted to, you wouldn’t have let them do that?
A Not at that particular time, no.
Q So you had them detained, right?
A Having worked the area that I’ve worked for as many years as I’ve worked and having the contact with them ...
Q The question is, did you have them detained; yes or no?
A Yes, we had them detained.
After this testimony the deputy essentially corroborated the sergeant’s testimony. There were no other witnesses for the state.
Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and section 901.161(2), (3) <& (4), Florida Statutes (1995) set out the standards for a stop and frisk as follows:
901.151 Stop and Frisk Law.
******
(2) Whenever any law enforcement officer of this state encounters any person under circumstances which reasonably indicate that such person has committed, is committing, or is about to commit a violation of the criminal laws of this state or the criminal ordinances of any municipality or county, he may temporarily detain such person for the purpose of ascertaining the identity of the person temporarily detained and the circumstances surrounding his presence abroad which led the officer to believe that he had committed, was committing, or was about to commit a criminal offense.
(3) No person shall be temporarily detained under the provisions of subsection (2) longer than is reasonably necessary to effect the purposes of that subsection. Such temporary detention shall not extend beyond the place where it was first effected or the immediate vicinity thereof.
(4) If at any time after the onset of the temporary detention authorized by subsection (2), probable cause for arrest of person shall appear, the person shall be arrested. If, after an inquiry into the circumstances which prompted the temporary detention, no probable cause for the arrest of the person shall appear, he shall be released.
There was no evidence from anyone that the stop and frisk law and Terry were considered, much less complied with. It is essential that police personnel, prosecutors and judges abide by the requirements of this law because otherwise citizens would be subject to, and, inevitably would suffer, detention from any police authority at any time for no reason. The stop and frisk law and Terry are not restrictions on the police. The Fourth Amendment to the United States Constitution and Article I, section 12 of the Florida Constitution are the restrictions. The statute, passed following Terry, and Ter *856 ry are definitions of limits, some could say expansions of, the right of the police to seize and search persons. The limits require a reasonable, articulable belief on the part of the officer that the person to be detained has committed, is committing or is about to commit a crime. No such circumstances existed here. See also D.G. v. State, 661 So.2d 76 (Fla. 2d DCA 1995) (juvenile’s delinquency adjudication for obstructing an officer without violence reversed where state failed to prove that his verbal protests crossed threshold from protected free speech to conduct obstructing officers in execution of their legal duties); S.D. v. State, 627 So.2d 1261 (Fla. 3d DCA ,1993) (same).
The motion for a judgment of acquittal should have been granted at the close of the state’s ’case and it was error to have adjudicated appellant a delinquent.
JUDGMENT REVERSED, APPELLANT DISCHARGED.
GRIFFIN and ANTOON, JJ., concur.