**UNITED STATES of America**

v.

**Larry J. WILKERSON, Appellant.**

No. 77–1932.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 24, 1978.

Decided July 26, 1978.

As Amended July 28, 1978.

David J. Cynamon, Washington, D. C. (appointed by this Court), for appellant.

Charles L. Hall, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty. and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on brief, for appellee.

Before TAMM and ROBINSON, Circuit Judges, and OBERDORFER,* United States District Judge for the United States District Court for the District of Columbia.

Opinion for the Court filed by OBER-DOFER, District Judge.

OBERDORFER, District Judge:

In a stipulated trial without a jury, the District Court found appellant guilty of un-lawfully possessing an unregistered sawed-off shotgun. Before the trial, the District Court denied appellant's motion to suppress the introduction of a pistol and sawed-off shotgun into evidence, holding that they were lawfully taken by police in a protective search of an automobile in which the appellant was riding as a passenger when he was arrested. This appeal tests that ruling.

We approve the ruling and affirm the conviction because the particular events which culminated in police discovery of the weapons provided reasonable, articulable suspicion that the self-protective, limited search of the car for weapons conducted here was necessary for the safety of the police.

Events preceding the weapons discovery transpired as follows: At about 6:00 a. m., May 13, 1977, Officer Harold Wooten of the District of Columbia Metropolitan Police Department was dispatched by radio to answer a traffic complaint about an automobile blocking a driveway at 1234 Massachusetts Avenue, N.W. in Washington. Officer Wooten was aware that the address and its neighborhood had been the source of numerous complaints involving prostitutes and juvenile robberies, among other things. As Wooten's police cruiser approached the address, he saw a 1977 automobile with out-of-state tags just starting to move from the driveway in front of the high-rise apartment building at the address. When Wooten pulled up to the building entrance, the receptionist came out and told the officer that the offending automobile had been parked at a prohibited place in the driveway with its motor running for about 30 minutes; three people were in the automobile, none of whom lived in the building, and that the automobile had just left with its lights out and the three in it. The officer then drove off in search of the automobile. A few minutes later he saw it near the highrise. It was traveling in excess of the speed limit without keeping within lanes and generally operating in a manner that would cause him to stop an automobile.

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1970).

After following it for a few blocks, he turned on his red signal. Traveling another 100 yards, the automobile stopped and the officer routinely radioed its license number to headquarters to learn whether the car was stolen.

The driver got out and walked back toward the officer. The driver, a male, was wearing a dress and a wig; a brassiere was exposed. When the officer asked for registration and permit, the driver replied that they were at home, and produced an auto rental agreement, but no personal identification. During this conversation, Officer Wooten questioned the driver about what appeared to be a credit card sticking out of the driver's brassiere. In response, he turned away, placed a hand in the area where the officer had seen a card, then turned back and said "What card?". Realizing that "something was kind of shaky," Officer Wooten requested the driver to step back into the car while he radioed for police assistance so that he could further "check out" the driver.

When assisting officers arrived, Officer Wooten, without waiting for a response to his initial radio inquiry as to the ownership of the car, stepped to the driver's side of the stopped car. He then asked the driver to step out again to explain the missing driver's license and the concealed credit card. The officer did not understand the driver's response; it made the officer realize for the first time, however, that the driver was a man, masquerading as a woman. The officer also observed the two passengers, one of whom was on the front seat with the driver and the other on the back seat, immediately behind the first. As the officer was questioning the driver, he noticed that the two passengers "were sort of, like uneasy, moving around a lot in the car."

Thereupon, Officer Wooten broke off further questioning and asked one of the assisting officers to stand next to the driver. Wooten then stepped around the front of the stopped automobile to the front passenger's door, where the appellant was seated. At Wooten's request the appellant and the rear seat passenger got out of the car. Without drawing his service weapon, Wooten looked into the front passenger compartment. There he noticed "this green coat in the front seat [which] appeared to be wrapped around something." Wooten reached into the front seat and placed his hand on the green coat, pressed it, and felt something like a shotgun; he then unwrapped it and saw a sawed-off shotgun. On checking, he found a shell in the chamber.

While Wooten was going through this process, there were at least four assisting officers present; the two automobile passengers and three or more of the assisting officers were standing, intermingled, beside the car. Prior to the discovery of the shotgun, none of the officers had frisked or handcuffed anyone. They had not made or threatened any arrest.

Upon discovering the shotgun, Officer Wooten alerted the other officers that he had found a shotgun and that there might be other weapons or contraband. In short order, Wooten unloaded the shotgun, and with the other officers, frisked the suspects, placed them under arrest, and warned them of their rights. One of the assisting officers, meanwhile, leaned into the right hand door to the rear passenger compartment and looked. Just beneath the front seat, he discovered the ".38" with six live rounds in it. The loaded revolver was visible and accessible to a person sitting in the back seat with about ¾ of it under the seat and ¼ protruding onto the floor of the rear passenger compartment.

In the course of the hearing on the motion to suppress the Court observed that Officer Wooten's police work which produced the contested evidence began when he went to the Massachusetts Avenue apartment house on the report of suspicious activity. The Court noted that "it is standard procedure for a police officer, who is going to arrest someone, to make sure he may do so without danger to his own life and limb." The Court considered the alternative available to the officer when he ordered the people out of the car: "[t]here is no reason to

**624**

assume that he could not have been shot upon the arrest of the driver without the permit." Accordingly, the Court denied the motion to suppress.

■ Appellant's challenge of the stop and the removal of the driver and his passengers from the car require little discussion in light of prior decisions by this Court and by the Supreme Court. The driveway parking complaint and the traffic violations gave reasonable cause for a stop, quite apart from Officer Wooten's other suspicions. E. g., Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); United States v. Montgomery, 182 U.S.App.D.C. 426, 561 F.2d 875 (1977). Weird and unsettling developments before and during the stop gave the officers the additional cause to order the driver and his passengers out of the car. United States v. Pelley, 572 F.2d 264 (10th Cir. 1978).

The only possibly serious question arises with respect to Officer Wooten's reaching into the car and patting the coat on the front seat before the stolen car report was received and before he had frisked or arrested anyone. Appellant relies on the general rule against the use in trial of evidence produced by warrantless searches; a rule to which there are only a few "specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). Appellant emphasizes that the contested search by the officer that disclosed the shotgun occurred before he had probable cause for the subsequent arrest; therefore, appellant contends, the search was not incident to an arrest and the shotgun which was discovered in that search is not admissible. Sibron v. New York, 392 U.S. 40, 63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

■ However, at least since Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), evidence discovered in the course of a reasonable search for weapons for the protection of a police officer has been admissible so long as the officer has reason to believe that he is dealing with an armed and dangerous person; the searching officer is not required to have probable cause for an arrest in order to make such a protective search. 392 U.S. at 27, 88 S.Ct. 1868.

Appellant emphasizes that the particular search at issue in Terry was a limited pat down of the suspect's outer clothing after the searching officer had begun to suspect that the person searched had been planning a robbery, a crime likely to involve a dangerous person armed with a gun. Here, appellant argues, the precautions taken by Officer Wooten and his colleagues, by ordering the occupants out of the car, and by outnumbering them by at least four to three, eliminated "any realistic possibility of danger to the police from anything contained in the automobile." Appellant points to the fact that Officer Wooten had not frisked the suspects when he reached into the car. This is cited as an objective indication that, prior to the discovery of the guns, there was no reasonable basis for a search of the automobile for them. Relying on the recent District of Columbia Court of Appeals decision in Tyler v. United States, 302 A.2d 748 (1973), appellant also claims that since there was no reasonable basis for a police conclusion that anything in the automobile posed any threat to their safety, the search of the car had no purpose but "to see what was inside," and the weapons produced from that search should have been suppressed.

Appellant's reliance on Tyler v. United States, supra, is misplaced. In that case the District of Columbia Court of Appeals found that there were "very few articulable facts indicating 'that criminal activity may be afoot.'" 302 A.2d at 749. Tyler lacked the cumulative, suspicion-arousing facts presented here that easily meet the Terry standard for a warrantless frisk.

■ To recapitulate: The officer received a radio report early in the morning about a car illegally blocking an apartment driveway. The apartment was in a crime prone area; as the officer approached the scene, he saw a car pull away without lights. A witness confirmed that the car just seen by the officer was occupied by

three strangers to the neighborhood, and had stood in the driveway for 30 minutes with its engine running. When the officer found the car and followed it, he noticed it was maneuvering illegally. When the officer stopped the car, its male driver, disguised as a female, alighted and disclosed that he had no license or permit. The officer observed that he was concealing a credit card in a bizarre manner, and unconvincingly denied that he had any credit card. When the officer later questioned the driver, his passengers behaved suspiciously. An experienced officer could have a reasonable suspicion that the three had committed or were about to perpetrate a crime of a nature often inducing those who engage in it to carry weapons.

Appellant also claims that the search of the car was not a protective search because the driver and passengers were not frisked until after the officer found the gun. *United States v. Branch*, 178 U.S.App.D.C. 99, 108 n. 24, 545 F.2d 177, 186 n. 24 (1976); *United States v. Collins*, 142 U.S.App.D.C. 100, 107–108, 439 F.2d 610, 617–18 (1971).** Appellant is obviously asking this Court to instruct the police on the priority of search once reasonable suspicion of danger exists.

■ It takes little imagination to realize that an armed suspect might hide his weapon in a car before getting out in response to a police order. Thereafter standing next to the car without handcuffs, either the driver or one of the passengers could have bolted to it, seized a weapon and fired before the officers could find cover. The record shows that as soon as the occupants were out of the car, the officer saw a jacket in plain view on the front seat. There is no evidence that the appellant closed the door when he stepped out of it. The jacket appeared to be wrapped around something. In the context of all else the officer then knew, this was suspicious in itself and, objectively viewed, would "warrant a man of reasonable caution in the belief" that it should be checked to determine whether the

jacket covered a weapon. Since the officer had just spied the suspicious jacket, it was natural and reasonable for him to make an immediate intrusion into the door of the car, limited initially to patting down the jacket lying on the front seat. There is no indication that Officer Wooten stepped into the car; he merely looked, reached, patted, and found weapons.

There was, of course, a variety of other alternatives. The officer could have frisked the driver and the passengers for weapons on their person before he searched for weapons in reach. He could have frisked the driver and arrested him without touching the passengers. He could have left the occupants in the car until he received radio advice about the status of the car. The officer could have merely given the driver a summons and let him drive away before the stolen car report was answered. Each of these courses of action is consistent with appellant's view of what is reasonable.

It is obvious, however, that each alternative course would have exposed Officer Wooten and his colleagues to danger which was eliminated when he reached into the front seat and patted the coat left lying there. Neither detainer nor frisk of three persons by four was safe for the officers as long as loaded weapons remained in reach in the car. As this Court has previously noted:

> Fourth Amendment jurisprudence involves prudence for the police as well as fairness for the citizens. A police officer 'need not defer . . . protective measures to the point of peril.' *United States v. Coates*, 161 U.S.App.D.C. 334, 339, 495 F.2d 160, 165 (1974) (citation omitted).

■ The officer's action in reaching into the front seat and patting the outside of the coat lying there in plain view was a reasonable and proper protective search for a weapon; the subsequent grasping of the weapon under the coat and the seizure of the revolver on the back seat followed inex-

---

** In neither of these two cases did the government urge that the warrantless searches involved were protective searches and the

Court's considerations of the question were in the hypothetical and were easily dismissed in light of the background facts of the two cases.

orably. Officer Wooten did not violate appellant's Fourth Amendment rights when he looked, reached, and patted the coat which lightly shielded the loaded shotgun.

The Order of the District Court denying the motion to suppress and the ensuing judgment of conviction should be and hereby are AFFIRMED.

■ Appellee represents that the sentences imposed in this case were invalid for failure to comply with 24 D.C.Code § 203 which requires the sentencing court to prescribe both a minimum and a maximum term. Accordingly, the case should be remanded to the District Court for resentencing.

*So ordered.*