STATE of Minnesota, Respondent,

v.

Earl Rex GILCHRIST, Appellant.

No. 50367.

Supreme Court of Minnesota.

July 3, 1980.

Rehearing Denied Jan. 21, 1981.

Meshbesher, Singer & Spence, Carol M. Grant and Kenneth Meshbesher, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Tom Foley, County Atty. and Steven C. DeCoster, Asst. County Atty., St. Paul, for respondent.

Heard before ROGOSHESKE, KELLY and YETKA, JJ., and considered and decided by the court en banc.

KELLY, Justice.

Defendant was convicted on stipulated facts at a court trial of possession of cocaine and possession of a handgun without a permit. Defendant had earlier contended at a Rasmussen hearing that certain evidence leading to his conviction, including the handgun and the cocaine, was the product of an illegal search and seizure. The Ramsey County District Court had rejected the claim and ruled the evidence admissible. Defendant now appeals his conviction, renewing his contention that the admitted evidence should have been suppressed. We affirm.

Shortly after 3:00 a.m. on the early morning of March 7, 1979, Sergeant Finney and Officers Frank Verdeja, Mark Busta, and Kenneth McIntosh of the St. Paul Police force were at the Bar-B-Q King restaurant at 474 University in St. Paul. They were there for observation of a suspected "after hours joint" above the restaurant.

During a discussion among the four officers, Busta remarked that earlier he had seen a silver Lincoln parked outside with Nebraska license plates. Busta and the others thought that the car was similar to one described in a handwritten notice or bulletin that had been posted at the roll call desk at the police headquarters. According to the officers,[1] the notice stated that one Earl Gilchrist was suspected of involvement in a homicide in Nebraska; that he had a .357 nickel, silver, or chrome plated revolver; that he was driving one of two vehicles, a late model Lincoln or a Chrysler, with Nebraska license plates; that he was traveling with a female friend; that he may be armed and dangerous; and that he may be in St. Paul. Gilchrist's photograph was on the notice, which was posted shortly before the date in question. The notice did not state that Gilchrist was wanted for homicide or that warrants for his arrest were outstanding. The officers thus believed that the notice gave them no cause to arrest, but only to "use extreme caution," or "stop and identify" Gilchrist, or contact Nebraska authorities. The policemen produced no copy of the notice, and later no copy could be found.

During the discussion, the four officers also talked about a previous incident the year before in which Gilchrist had allegedly shot at another person and had fled the

---

1. ˙ Officers Verdeja, Busta, and McIntosh testified at the Rasmussen hearing. Sergent Finney did not.

scene. This incident allegedly occurred at an "after hours joint" similar to the one above the Bar-B-Q King.

The officers then walked out to the parking lot to check out the car that Busta had seen. The car, a silver 4-door Lincoln Versailles or Continental, was about 25 to 30 feet away from the Bar-B-Q King. The officers saw two figures in the front seat of the Lincoln smoking cigarettes. Busta immediately recognized Gilchrist, but the others apparently did not.

Officers McIntosh and Verdeja then proceeded to the passenger side of the car. McIntosh tapped on the window and asked the passenger to step out of the car and produce identification. The man produced identification, after which McIntosh informed him of the purpose of the stop, frisked him for weapons, and checked for outstanding warrants on him. No weapons were found, and there were no outstanding warrants, so the passenger was released, and he left the scene.

Meanwhile, Sergeant Finney had approached defendant Gilchrist who was in the driver's seat. Finney asked defendant to get out of the car and to produce identification, and defendant did so. The chronological order of what happened next is not exactly clear. Either Finney patted down the defendant or asked Verdeja and McIntosh to search the car for weapons; Verdeja was to search the front seat and McIntosh the back.

At any rate, Verdeja began to search the front seat of the car. Gilchrist at this time was about 6 feet away at the back of the car. Verdeja first patted down the plastic covering on the front seat, and then reached under the seat. On top of the transmission hump, between the passenger's and driver's side, he felt a hard object "snug underneath the seat." He suspected it was a weapon and pulled it out. It was a

revolver, but not the gun named on the police bulletin.

Officer Busta testified that, after the search of the front seat had commenced, defendant made a move toward the car, but was restrained by Sergeant Finney. During this time McIntosh searched the back seat and found nothing.

About the time the car was searched, Finney patted defendant down, and found a cut soda straw in his pocket. This straw was recognized as a type of instrument used to ingest cocaine.

After the gun was found under the front seat, defendant was handcuffed, arrested, and brought back to the police station. There he was searched and an envelope full of white powder, later identified as cocaine, was found in his pocket. He was then charged with possession of a pistol without a permit under Minn.Stat. § 624.714, subd. 1 (1978), and possession of cocaine under Minn.Stat. §§ 152.02, subd. 3; 152.09, subd. 1(2); and 152.15, subd. 2(1) (1978). At the Rasmussen Hearing, where the defendant challenged the gun, cocaine, and soda straw as either being seized during an unlawful search, or being the fruit thereof, the judge found that the police had reasonable suspicion to stop defendant, and that a reasonable frisk for weapons under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), included the area under the front seat. The evidence was thus ruled admissible. After a court trial and conviction on stipulated facts, the defendant appeals.

The state contends that the trial court was correct in its determination that the police had sufficient "articulable suspicion" to subject defendant to a forcible stop and limited weapons search under the doctrine of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and that the search under the front seat of defendant's car came within the scope of such a search.[2]

---

**2.** The State also appears to argue that the information available to the police on the early morning of March 7, 1979, constituted probable cause in the conventional sense to search the defendant's automobile. Since we find on oth-

■ *Terry v. Ohio* provides that a police officer can lawfully make a forcible investigative stop of an individual and frisk him for weapons on less than traditional probable cause if he is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." 392 U.S. at 21, 88 S.Ct. at 1880. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27, 88 S.Ct. at 1883. *See also Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *State v. Johnson*, 257 N.W.2d 308 (Minn.1977); *State v. McKinley*, 305 Minn. 297, 232 N.W.2d 906 (1975); *City of St. Paul v. Vaughn*, 306 Minn. 337, 237 N.W.2d 365 (1975); *State v. Gannaway*, 291 Minn. 391, 191 N.W.2d 555 (1971).

■ The information that will support an investigative stop and frisk need not be obtained from an officer's personal observation; it may rather be based on an informant's tip. *See Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972). The officer is also entitled to approach a suspect with the purpose "to maintain the status quo momentarily while obtaining more information  *  *  *." *Id.* at 146, 92 S.Ct. at 1923. When the stop is of an automobile, it is proper for the officer for his safety to require occupants of the automobile to get out. *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam).

■ Under this standard, it would appear that the police officers were justified in stopping defendant and investigating. The officers had information, apparently from regular police transmission sources,[3] that

defendant may have been involved in a homicide, that he may be armed, and that Nebraska authorities desired more information. They further knew that defendant, about a year earlier, had been involved in a firearms-related incident near an "after hours joint" similar to the one above the Bar-B-Q King. They could reasonably have approached defendant's car initially to positively identify defendant for the legitimate police purpose of informing Nebraska authorities that he was in St. Paul, or for finding out why, at that extremely early hour, he was again outside an "after hours joint." Given defendant's violent history, and the nature of the crime alleged against him, the police could have reasonably feared for their safety and ordered the defendant out of the car to frisk him as part of a legitimate investigative stop.

This is not to say that there is not some force to defendant's argument. In most of the cases where radio or other police bulletins, or informants' tips, were considered to contain sufficient information for an investigative stop, either the element of an arrest warrant was present, or else some criminal activity, or preparation for criminal activity, that had happened shortly prior to the reception of such information was alleged. In the current case, the information received from the bulletin was allegedly quite stale. Still, "[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry [v. Ohio]* recognizes that it may be the essence of good police work to adopt an intermediate response." *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). Given the totality of the circumstances: the bulletin, the time of day, the location of the car, and the defend-

---

er grounds that the search was lawful, we need not address this contention.

**3.** Cf. *United States v. Impson*, 482 F.2d 197, 199 (5th Cir.), *cert. denied*, 414 U.S. 1009, 94 S.Ct. 371, 38 L.Ed.2d 246 (1973). ("[T]he

searching-arresting officer can act on the basis of information of which he has no personal knowledge which has been relayed to him by police transmission facilities.")

ant's history of behavior at places such as the one he was parked outside of, the police were justified in making a forcible stop to ask questions and receive identification. We thus conclude that the initial stop for identification and some sort of frisk of defendant was reasonable under the circumstances.

Having established that there was sufficient information available to the police to warrant an investigative stop and a limited search for weapons, we now turn to the question whether the intrusion underneath the front seat of defendant's car was outside the scope of such a limited search.

■ The scope of the limited search for weapons under *Terry* must be narrowly confined to the purposes the intrusion is supposed to serve; it is a "frisk for weapons" rather than a "search for evidence." In the "frisk" as well as in other types of searches, "[t]he scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Terry v. Ohio,* 392 U.S. at 19, 88 S.Ct. at 1878. Since "[t]he sole justification of the search * * * is the protection of the police officer and others nearby * * it must * * * be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Id.* at 29, 88 S.Ct. at 1884.[4] The United States Supreme Court in recent cases has reiterated that "[t]he *Terry* case created an exception to the requirement of probable cause, an exception whose 'narrow scope' this Court 'has been careful to maintain.' " *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979); accord, *Dunaway v. New York,* 442 U.S. 200, 206--13, 99 S.Ct. 2248, 2253–56, 60 L.Ed.2d 824 (1979).

■ Although, from the relevant principles, it can be seen that this is a close case whether the police were reasonably justified in searching beneath the front seat of defendant's car, we conclude that the facts indicate that the search was reasonably tailored to its justification—the safety of the officers. The defendant in the present case was known to carry firearms, and he had been connected with a homicide in which a firearm was apparently used. He had also been connected with a shooting outside of a similar "after hours" establishment. The police officer may have reasonably been concerned that, when defendant was allowed to reenter his car after the search, he would be able to reach under the seat, pull out a gun, and start shooting. Thus the police officers were justified in feeling that, at a minimum, they must run a hand underneath the seat in the area within the suspect's immediate reach when he would reenter the car, even though the defendant was outside of the car at the time the limited search was being conducted. *See, e.g. United States v. Wilkerson,* 598 F.2d 621 (D.C.Cir.1978); *Herrin v. State,* 349 So.2d 103 (Ala.Crim.App.), cert. denied, 349 So.2d 110 (Ala.1977); *Commonwealth v. Almeida,* 373 Mass. 266, 366 N.E.2d 756 (1977); *State v. Brown,* 160 N.J.Super. 227, 389 A.2d 507 (Law Div.1978).

We realize that a noted commentator has expressed the opinion "that it 'can be argued with some persuasiveness that the defendant could hardly be viewed as a potential assailant after he had returned to his vehicle and knew he had not been detained by the police.' "[5] 3 W. LaFave, *Search and Seizure* § 9.4 at 137 (1978) (quoting *Commonwealth v. Silva,* 366 Mass. 402, 409, 318 N.E.2d 895, 900 (1974)). However, the same

---

4. In this connection, " * * * [t]he touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). Reasonableness, of course, depends 'on a balance between the public interest, and the individual's right to personal security free from arbitrary interferences by law officers.' *United States v. Brignoni-Ponce,* 422

U.S. 873, 878, 90 S.Ct. 2575, 45 L.Ed.2d 607 (1975)." *Pennsylvania v. Mimms,* 434 U.S. 106, 108, 98 S.Ct. 330, 332 n. 1, 54 L.Ed.2d 331 (1977) (quoted in *State v. Ferrise,* 269 N.W.2d 888, 890 n. 1 (1978)).

5. *See also Government of Canal Zone v. Bender,* 573 F.2d 1329 (5th Cir. 1978); *State v. Greenwald,* 369 So.2d 1317 (La.1979); *City of Portland v. Poindexter,* 38 Or.App. 551, 590 P.2d 781 (1979).

commentator goes on to state that "[t]here may be special situations in which it can fairly be assumed that the danger continues * * * ."ᐟ Without deciding that the police are justified in every case in believing that a suspect remains a danger after having been subject to an investigative stop and frisk, we feel that in the present case, because of defendant's past record, the police were justified in finding a "special situation" permitting the search under the front seat of defendant's car. The trial court is accordingly affirmed.

WAHL, Justice (dissenting).

I respectfully dissent. In my opinion the decision of the court today represents a significant departure from the "stop and frisk" doctrine as enunciated in the United States Supreme Court trilogy of cases, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *Peters v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), and in our own case, *State v. Gannaway*, 291 Minn. 392, 191 N.W.2d 555 (1971), all of which dictate a contrary result with regard to the "frisk" conducted in this case. Even granted that the officers possessed "specific and articulable facts" which justified both the stop and the frisk, a frisk is constitutionally limited to a pat-down search of the outer clothing of the suspect to discover weapons which might be used to assault the officer. *Terry v. Ohio*, 392 U.S. at 29, 88 S.Ct. at 1884. It is a limited search of the person. It must be reasonably restricted in scope to the protection of the officer by disarming a potentially dangerous person. Here the officer felt no hard or dangerous object. No reasonable officer could have believed that a soda straw endangered his safety. The search should have ended here, just as this court declared that the search in *Gannaway* should have ended after the discovery of the corn cob pipe.

The search of the car, either before or after the finding of the soda straw in the search of defendant's person, is not justified as a frisk. It goes beyond the constitutional definition and scope of a frisk and even if, by some stretch of the imagination, it did not, the general non-hostile atmosphere, the lack of furtive gestures by defendant prior to the search, his lack of access to the car while the investigation took place, and the seeming unconcern on the part of the police for their safety, as indicated by the chronology of their actions, all indicate that the search was not reasonably justified by a concern for the officers' immediate safety. Without probable cause to search the car, which the officers admittedly did not possess, the seizure of the gun must fall, and with it, defendant's arrest and the seizure of the cocaine at the station house. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). As we stated in *State v. Curtis*, 290 Minn. 429, 437, 190 N.W.2d 631, 636 (1971), "subsequently discovered facts cannot retroactively serve to validate a search which was otherwise unlawful."

ROGOSHESKE, Justice (dissenting).

I do not believe the "stop and frisk" doctrine should be extended and hence join the dissent of Justice Wahl.