**STATE of Minnesota, Respondent,**

v.

**Ernesto Ramos LAMAR, Appellant.**

**No. C6–85–1219.**

Court of Appeals of Minnesota.

Feb. 18, 1986.

Review Denied March 27, 1986.

Hubert H. Humphrey, III, Atty. Gen., Tom Foley, Ramsey Co. Atty., Steven C. DeCoster, Asst. Co. Atty., St. Paul, for respondent.

C. Paul Jones, Public Defender, Mark F. Anderson, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by WOZNIAK, P.J., and SEDGWICK, and FORSBERG, JJ., with oral argument waived.

## OPINION

FORSBERG, Judge.

Ernesto Ramos Lamar appeals from a conviction of unlawful possession of a pistol. He contends a police officer did not have an articulable basis for an investigatory stop and the trial court erred in not suppressing evidence obtained as a result of that stop.

## FACTS

At about 2:00 a.m. on November 13, 1984, St. Paul Police Sergeant Brook Schaub entered a building at 476 University Avenue in St. Paul to make a "routine premises check" for violations of liquor and gambling licensing laws. The second floor of the building is operated as an "after-hours joint" that has been the subject of repeated police involvement. Numerous warrants have been executed and illegal alcohol, drugs, gambling devices, and guns seized. *See State v. Gilchrist,* 299 N.W.2d 913 (Minn.1981). There have been several shooting incidents there in the past few years. Sgt. Schaub had participated in a recent raid in which three guns were found.

As he climbed the stairs, Schaub saw one of two "doormen" enter the establishment. He assumed the doorman was following his practice of informing the patrons that police were there. When Schaub got to the door, he saw the doorman talking to a group of people and recognized one of them as appellant.

Sgt. Schaub said he knew appellant from police reports, files, interview cards, and his conversations with other officers. He knew that appellant had at least one previous arrest on a weapons charge, frequently carried a weapon, had been at the scene of several "shots fired" reports, and had been recently arrested for attempted kidnapping. Schaub was not aware of the disposition of the kidnapping arrest or of any warrant for appellant's arrest.

The officer saw the doorman talk to appellant and presumably tell him that police were present. He then saw appellant:

make a quick movement towards another area of the bar. Then as he apparently saw me approach he just as quickly returned to what he was doing.

Sgt. Schaub further described appellant's "furtive movement":

Mr. Ramos' back was toward the door. As soon as the doorman approached and what I assume, passed the word police were on the premises he made a move toward the bathroom area and another area off to the side. At this point I was quickly approaching and again just as quickly turned back to the group he was with.

Schaub decided to conduct a field interview; he asked appellant to move "four or five feet" into a better lighted area and asked his name to verify his identity. The officer wanted to get complete information in order to check for warrants, inquire into appellant's recent activities, and ask him why he made a quick movement when the officer entered the bar.

Before he completed the field interview card, Sgt. Schaub saw "a heavy bulge approximately four inches in length, similar in size to a small automatic weapon" in the right front pocket of appellant's pants. The bulge "wasn't distinctive" but "appeared to be a hard heavy object." Since he knew appellant had carried weapons in the past, the officer decided to check for weapons. He had appellant remove his jacket and put him in a "wall search position."

Appellant began resisting the search effort by moving around. He was sprayed with a "small amount of chemical irritant" and "pressured" against the wall. Sgt. Schaub kept appellant's hands away from his pockets and radioed for assistance. Another officer arrived and appellant was handcuffed. Sgt. Schaub then reached into appellant's pocket and pulled out a fully loaded .25 caliber automatic; one round was chambered. Appellant was arrested. At the police station he said, "I always carry a gun."

Appellant was charged with possession of a pistol in violation of Minn.Stat. § 624.-713, subd. 1(b) (1984) because he had a 1983 conviction for burglary, a "crime of violence." *See* Minn.Stat. § 624.712, subd. 5 (1984). The only issue at the *Rasmussen* portion of the omnibus hearing was whether police had seized the pistol and ammunition in violation of appellant's fourth amendment rights.

A demonstration was conducted by the defense to show that Sgt. Schaub could not have seen a bulge in appellant's pocket. Schaub could not recall what type of coat appellant was wearing, but thought it was "waist length." Appellant put on a long leather coat and put the gun in his pocket; the officer said he could not see the firearm. Appellant then testified he had been wearing a long leather coat.

The trial court denied appellant's motion to suppress the pistol and ammunition:

my finding has nothing to do with the bulge or lack thereof. The place we are talking about is a known haunt of criminal elements where guns are not infrequently found. * * * The police officer is going into an after-hours joint where he is known to the proprietor and others, having previously engaged in search warrants and probably arrests on the premises; so in the very real sense the officer is proceeding into enemy territory. He is entitled to talk to the doorman or to talk to somebody at the door. He saw Mr. Ramos do something suspicious, a quick movement, asked him to step into a more lighted area and under all the circumstances decided to check for weapons. * * * Accordingly I think that under all the circumstances the officer's actions were legitimate and justified to protect himself in a place where he had every right to be and I am going to receive the pistol into evidence in the trial of this matter.

Appellant then waived his right to a jury trial and the case was submitted to the court on the complaint and the *Rasmussen* testimony. Appellant was convicted and sentenced to 15 months.

## ISSUE

Did the police officer have specific and articulable facts that justified an investigatory stop?

## ANALYSIS

Appellant's only contention on this appeal is that the police officer's initial stop violated his rights under the Fourth and Fourteenth Amendments of the United States Constitution. In *State v. Gobely*, 366 N.W.2d 600 (Minn.1985), the Minnesota Supreme Court reiterated the standard for evaluating such an intrusion by police:

> In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) the United States Supreme Court held that a police officer may stop an individual on less than probable cause when faced with sufficiently suspicious behavior to warrant further investigation and may conduct a reasonable search for weapons where the police officer "has reason to believe that he is dealing with an armed and dangerous individual." *Id.* at 27, 88 S.Ct. at 1883. To justify the intrusion, the police must be able to point to specific and articulable facts which, taken together with rational inferences, would " 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Id.* at 22, 88 S.Ct. at 1880.

*Id.* at 602.

In applying this standard, a court must consider the facts in light of the surrounding circumstances and from the point of view of a trained police officer. *See Thomeczek v. Commissioner of Public Safety*, 364 N.W.2d 471, 472 (Minn.Ct.App.1985) (citing *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). Several Minnesota cases have held that investigatory stops were justified under this standard.

In *Gobely* the defendant entered an apartment where police officers were executing a search warrant for stolen property. The officers identified themselves and asked the defendant to do the same. He refused and "made a 90-degree turn, as if to leave." He was grabbed by the officers and put up against a wall. A subsequent search of defendant revealed several pieces of stolen jewelry; he was arrested and convicted of receiving stolen property.

*Gobely*, 366 N.W.2d at 601–02. The supreme court believed the stop was justified:

> In this case, the officers had recovered admittedly stolen property within the apartment and knew that individuals in addition to the occupants, some of whom had been named by an informant, had participated in the thefts. Defendant was obviously acquainted with the occupants and had refused to identify himself when asked, instead turning as if to leave. Under the circumstances, we conclude that the officers were justified in stopping defendant.

*Id.* at 602.

The defendant in *State v. Gilchrist*, 299 N.W.2d 913 (Minn.1981) was approached by police officers as he sat in a parked car outside the same "after-hours joint" involved in this case. One of the officers recognized the car from a notice he had seen at police headquarters that indicated defendant could be driving the car, might be armed and dangerous, and was "suspected of involvement in a homicide" in Nebraska. The officers asked defendant to step out of the car and produce identification, which he did. One officer patted down defendant while other officers searched the car and found a gun under the front seat. A thorough search of defendant at the police station uncovered some cocaine he had in his pocket. Defendant was convicted for possession of both the gun and the cocaine. *Id.* at 914–15. The supreme court upheld the stop because:

> The officers had information, apparently from regular police transmission sources, that defendant may have been involved in a homicide, that he may be armed, and that Nebraska authorities desired more information. They further knew that defendant, about a year earlier, had been involved in a firearms-related incident near an "after hours joint" similar to the one above the Bar-B-Q King. They could reasonably have approached defendant's car initially to positively identify defendant for the legitimate police purpose of informing Nebraska authorities that he was in St. Paul, or for finding out why, at that extremely early hour, he was

again outside an "after hours joint." Given defendant's violent history, and the nature of the crime alleged against him, the police could have reasonably feared for their safety and ordered the defendant out of the car to frisk him as part of a legitimate investigative stop. *Id.* at 916.

A defendant's past criminal behavior is a factor that may be considered by a court in determining whether an investigatory stop and subsequent "pat down" search were justified. *State v. Brown*, 345 N.W.2d 233, 237 (Minn.1984); *Gilchrist*, 299 N.W.2d at 916. The police officers in *Brown* were responding to a "suspicious activity" call and found the defendant standing in the street. He was searched, placed in the squad car, and questioned. A threatening statement he then made to police was later held admissible at his trial for first-degree murder. 345 N.W.2d at 236–37.

The state asserts that this stop was justified because: (1) appellant was in an "after hours joint" where illegal activities are fostered; (2) the officer was aware of appellant's prior suspected criminal activity and involvement with weapons; and (3) appellant made a suspicious movement when he became aware of the officer's presence. We agree that these specific facts and observations, when viewed from the perspective of a trained police officer, warranted his inference that appellant was involved in some illegal activity.

The officer knew this "after-hours joint" was the scene of previous illegal activities and shooting incidents. These surrounding circumstances were properly considered by the trial court when it found that Sgt. Schaub was in "enemy territory" and could act accordingly. *See United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *see also Gilchrist*, 299 N.W.2d at 916.

Sgt. Schaub also knew that appellant had recently been arrested as a suspect in an attempted kidnapping, was at the scene of previous weapons-related incidents, and was arrested in Miami for illegal possession of a weapon. His decision to interview appellant was based in part on his personal knowledge and in part on information which was "relayed to him by police transmission facilities." *United States v. Impson*, 482 F.2d 197, 199 (5th Cir.), *cert. denied*, 414 U.S. 1009, 94 S.Ct. 371, 38 L.Ed.2d 246 (1973).

Appellant also made a "quick movement" when he was apparently notified that a police officer was present; his back was to the officer when he made this movement. When appellant saw the officer, he returned to the group he was with. The officer here testified that it was this movement that focused his attention on appellant. The fact that appellant made this movement must be assessed from the point of view of a trained police officer. *Thomeczek*, 364 N.W.2d at 472. Such an officer might reasonably infer from appellant's movement either that appellant did not want to be seen by a police officer or that he was trying to get rid of something he didn't want police to find. Appellant could not know at that time if the appearance of the officer was the prelude to a "raid" of the joint and a search of the clientele. His instinctive movement supported the officer's decision to inquire further into appellant's identity, recent activities, and possible warrants.

## DECISION

The trial court did not err in concluding the police officer's stop of appellant was justified by specific and articulable facts and the surrounding circumstances.

Affirmed.