**STATE of Minnesota, Respondent,**

**v.**

**Raymond Maurice WADDELL, Appellant.**

**No. C4–01–1330.**

Supreme Court of Minnesota.

Jan. 30, 2003.

Mark S. Wernick, Minneapolis, MN, for Appellant.

Susan Gaertner, Ramsey County Attorney, Darrell C. Hill, Assistant County Attorney, Saint Paul, MN, for Respondent.

## OPINION

BLATZ, Chief Justice.

Appellant Raymond Waddell was convicted of one count of murder in the first degree, Minn.Stat. § 609.185 (2000). In this direct appeal, Waddell contends that the vehicle stop that resulted in his arrest and eventual conviction was improper. Additionally, Waddell asserts that he was held in violation of the "prompt appearance" rule, Minn. R.Crim. P. 4.02, subd. 5, and that such a violation warrants suppression of his statements made while in custody. We affirm.

On the evening of December 7, 2000, Vickie Mollenhoff was working as a cashier at the Minni–Market, located in Saint Paul's East Side. The owner, Daniel Su, was also present in the store. Waddell, Anthony Williams, and Jerry Carroll, who had recently failed in their efforts to sell purported methamphetamine, decided to rob the Minni–Market. Waddell placed a gun in the pocket of a light-colored hooded sweatshirt and entered the market with Williams.

Waddell and Williams picked up some candy and went to the register. Mollenhoff rang up the items. As she did so, Waddell pulled out the gun, pointed it at Mollenhoff, and demanded money. When she was unable to open the register, Waddell shot Mollenhoff in the face, killing her. Meanwhile, another Minni Market customer had hidden herself in the restroom and contacted the Saint Paul Police Department with a cellular phone to report the shooting. The first police officers on the scene obtained a description of the suspects from that customer. A surveillance video of the store was also available to the officers.

Immediately prior to the shooting, Steven Mudek had driven through the parking lot of the Minni–Market en route to his

mother's home. He saw two or three black males sitting outside next to a station wagon. When Mudek left his mother's home a few minutes later, he saw the police at the Minni–Market. He then stopped and told police about the men he had seen and described their vehicle as a dark 1985–1989 General Motors J-model station wagon.

Police dispatches from the evening of December 7 informed officers that there was a shooting at the Minni–Market, and that two suspects were involved. One suspect was described as approximately 6 feet tall, 200 pounds, wearing a black ski mask and a black sweatshirt. The other was described as thin, wearing low-cut baggy corduroys. Later dispatched updates included a description of the vehicle: a dark blue or black station wagon—possibly a Chevrolet Celebrity—with three black males inside. The suspect descriptions were also updated. Police were now told that the suspects were two black males, armed and dangerous, both in their 20s, and that the smaller one was 5 feet, 2 inches tall, with a "scraggly beard."

Two-and-one-half hours after the shooting, approximately 6–8 miles from the Minni–Market, Officer David Strecker was on patrol in the Frogtown area of Saint Paul when he saw a "darker colored real dirty station wagon similar to a Chevy Celebrity." The vehicle contained four black males in their 20s. Strecker, after discussion with his partner, believed it to be the vehicle involved in the Minni–Market shooting, activated his lights and stopped the vehicle. The vehicle stopped was a 1987 Pontiac 6000 station wagon, which has a body type similar to a Chevrolet Celebrity. News of the stop was broadcasted immediately, and other squad cars arrived at the scene. Officers approached the vehicle with guns drawn, but at their side. Waddell, who was sitting in the passenger seat, and the other three occupants were removed from the vehicle, frisked for weapons, and placed in separate squad cars. No weapons were found on any of the occupants.

While the occupants were being frisked by police officers, Officer Tracy Henry searched the vehicle for weapons. Reaching between the passenger seat and the center console, she felt a hard object with something soft covering it. The hard object turned out to be the seat rails, covered with a black neoprene ski mask. The officer removed the ski mask and left it on the passenger seat.

While the vehicle search was taking place, Officer Peter Semenkewitz telephoned Sergeant Richard Munoz, a homicide investigator working on the case, and gave him a description of the vehicle occupants. Semenkewitz also described the ski mask, and Munoz, who had seen the surveillance video of the robbery, realized that the description matched the exact type of ski mask worn by the suspects. In the meantime, other officers at the scene had decided to release the occupants of the vehicle, including Waddell. Waddell returned to the stopped vehicle and again sat in the passenger seat.

Sergeant Munoz then instructed Officer Semenkewitz to remove Waddell and locate the ski mask. When Waddell exited the vehicle, the ski mask was no longer on the passenger seat. Waddell was searched again, but the ski mask was not located on him. The mask was finally found in the center console, hidden under some papers. Via telephone, Munoz told Semenkewitz that all the occupants should be brought to the police station. A large hooded sweatshirt, matching the description of the clothing worn by the larger suspect, was found in the vehicle.

Waddell was brought to the police station late on Thursday, December 7, 2000,

where he was held until brought to court for his first appearance on Tuesday, December 12, 2000. He was interviewed four times prior to being formally charged. The first interview occurred a few hours after the arrest. Waddell was given *Miranda* warnings, and he agreed to speak with the officers. During the interview, Waddell stated he was at his sister's home at the time of the shooting. He denied owning the sweatshirt or the ski mask.

Prior to Waddell's second interview, during which he continued to deny involvement in the crime, the state applied to the district court for an extension of time in which to present Waddell in court for his first appearance. The state claimed that such an extension was necessary to reformat a surveillance videotape, take physical measurements at the scene, further analyze physical evidence at the scene, obtain and execute search warrants, and interview witnesses without interference. On Friday, December 8, 2000, the court granted the extension until "no later than 1:30 p.m., Tuesday, December 12, 2000."

A third interview occurred during the evening of Sunday, December 10. Prior to this interview, a search warrant had been executed at the apartment of Anthony Williams, Waddell's companion at the Minni–Market. The search recovered the gun believed to have been used in the robbery, ammunition, and other evidence. When interviewed, Waddell continued to deny involvement in the crime and ownership of both the sweatshirt and the ski mask.

Waddell was then returned to jail, which also housed Williams.

On December 11 at 1:30 p.m., Waddell initiated a fourth interview with police. During the interview, Waddell admitted to the crime and detailed his involvement. Subsequently, Waddell was charged with murder in the first degree.

At the district court level, Waddell challenged the stop and subsequent search of the vehicle. Specifically, Waddell argued that the police did not have reasonable articulable suspicion to stop the vehicle in which he was a passenger, and that the evidence obtained on December 7 and all statements made by Waddell should be suppressed. The district court found that, based on the totality of the circumstances, the officers had reasonable and articulable suspicion of criminal activity sufficient to justify the stop and denied the motion to suppress. Waddell also moved to suppress his confession on the basis that the state violated the prompt appearance rule, Minn. R.Crim. P. 4.02, subd. 5(1). The district court denied that motion as well. After a jury trial, Waddell was found guilty and was convicted of first-degree murder.

I.

On appeal, Waddell raises three issues. Waddell asserts that the police did not have reasonable articulable suspicion to stop the vehicle in which he was a passenger.[1] Specifically, Waddell contends that the descriptions of the vehicle

---

1. It is undisputed that Waddell did not own the vehicle in which he was stopped. The district court found that Waddell had no legitimate expectation of privacy in the area or items searched, and hence no standing to challenge the stop. On appeal, this reasoning is urged upon the court. In so arguing, the state contends that in *State v. Brown*, 345 N.W.2d 233 (Minn.1984), this court adopted the holding of *Rakas v. Illinois*, 439 U.S. 128,

99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In *Rakas*, the United States Supreme Court held that an automobile passenger who failed to assert a possessory or property interest in the areas searched and the property seized could not properly challenge the search. 439 U.S. at 130–31, 149–50, 99 S.Ct. 421. Because we hold that the stop and subsequent investigatory search were proper, we need not address this issue.

and its occupants that the arresting officers received over the dispatch were far too general to warrant even an investigatory stop of the Pontiac 6000. On that basis, Waddell further asserts that all evidence seized from the vehicle should have been suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 484, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ The trial court's determination of reasonable suspicion as it relates to limited investigatory stops conducted pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), is reviewed de novo. *State v. Munson,* 594 N.W.2d 128, 135 (Minn.1999). Because the facts of this case are not in dispute, appellate review simply requires that we "analyze the testimony of the officers and determine whether, as a matter of law, his observations provided an adequate basis for the stop." *Berge v. Comm. of Public Safety,* 374 N.W.2d 730, 732 (Minn.1985).

■ Both the United States and Minnesota Constitutions prohibit unreasonable searches and seizures by the government of "persons, houses, papers and effects." U.S. Const. amend. IV; Minn. Const. art. I, § 10. Those searches conducted outside the judicial process are *per se* unreasonable, save for a few exceptions. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In contrast, however, brief investigatory stops are permissible if the officer can be said to have had a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). A brief investigatory stop requires only reasonable suspicion of criminal activity, a lesser quantum of proof than probable cause. *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968);

*Munson,* 594 N.W.2d at 136. Our court applied the principles of a *Terry* stop to automobiles in *State v. McKinley,* 305 Minn. 297, 232 N.W.2d 906 (1975).

■ Reasonable, articulable suspicion requires a showing that the stop was "not the product of mere whim, caprice, or idle curiosity." *State v. Pike,* 551 N.W.2d 919, 921 (Minn.1996). Here, police officers received dispatch information that contained the following facts:

-The body type of the car [a station wagon, possibly a Chevrolet Celebrity]

-The color of the station wagon [dark blue or black]

-The number, gender, race, and age of the occupants [three black males in their mid–20s]

-The significant height discrepancy between the two suspects who entered the Minni–Market.

The vehicle stopped was gray in color and encrusted with winter road salt. It contained four black males who appeared to be the approximate age of the suspects. There was a significant discrepancy in size between Waddell and another occupant, but the state concedes that this height disparity was not evident until the occupants were removed from the vehicle.

At the *Rasmussen* hearing, one officer testified that, in his experience, it was unusual to see a group of young people in a station wagon, and this, combined with the information contained in the dispatches, made him suspicious. Officers also testified that they had not stopped any other station wagons that evening, although they later testified that at trial that they had seen other vehicles of that body type. Testimony at the hearing also established that the Pontiac 6000 station wagon was similar in body style to that of a Chevrolet Celebrity. Dispatches indicated that the vehicle was dark blue or black, when in

fact the vehicle was gray. However, pictures submitted at the *Rasmussen* hearing made clear that the vehicle's silver-gray color was considerably obscured by road salt.

Given that considerable discretion will be given to an officer's decision to conduct an investigatory stop, the decision to stop a vehicle very similar in body style but slightly lighter in color cannot be considered mere caprice or whim. *See State v. Richardson,* 622 N.W.2d 823, 825 (Minn. 2001). Further, the vehicle's occupants matched the suspect descriptions in all respects—age, gender, race. To be sure, there were four occupants of the vehicle rather than three, but, as it was not inconceivable that the original occupants could have picked up an additional passenger in the hours following the crime, the officers did not behave unreasonably in choosing to stop the vehicle. Therefore, we hold that the police officers had reasonable, articulable suspicion that the occupants of the vehicle had been involved in the Minni–Market robbery, and lawfully stopped the vehicle.

## II.

 We then turn to the issue of whether the subsequent search of the vehicle was proper. A protective search of the passenger compartment of the vehicle, limited to those areas in which a weapon may be placed or hidden, is permissible if the officer possesses a reasonable belief, based on specific and articulable facts, that the suspect is dangerous and may gain immediate control of a weapon. *Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). *See also State v. Gilchrist,* 299 N.W.2d 913, 916 (Minn.1980) (holding that search of area under front passenger seat of a validly stopped vehicle was justified for officer safety). If, while conducting a legitimate protective search

of the interior of the vehicle the officer discovers other evidence of a crime, the Fourth Amendment does not require its suppression. *Long,* 463 U.S. at 1050, 103 S.Ct. 3469.

On the facts before us, we conclude that the protective search of the vehicle and the seizure of the ski mask were justified. When the officers made the stop, they knew that one of the Minni–Market robbers had shot the cashier, and they had an objectively reasonable basis for believing that the occupants of the vehicle were armed or had immediate access to a weapon. Officer Henry conducted an appropriately limited search of the vehicle's interior. When during the search the officer felt a hard object between the seat and center console, it was reasonable for her to remove its soft covering in order to determine whether the object was a weapon. Although it was not immediately apparent to Officer Henry that the ski mask was evidence in the robbery, that became apparent once the officers learned that the ski mask matched the description of the one used in the robbery. Accordingly, we hold that the district court did not err in admitting the ski mask into evidence at trial.

## III.

 Waddell contends that he was held in violation of the prompt appearance rule, Minn. R.Crim. P. 4.02, subd. 5(1), which provides that an arrestee shall be brought before a judge or judicial officer "without unnecessary delay, and in any event, not more than 36 hours after the arrest." The 36-hour time period is calculated exclusive of the day of arrest, Sundays, and legal holidays. In "exceptional cases," the state may seek relief from Rule 4.02 pursuant to Minn. R.Crim. P. 34.02. *See* Minn. R.Crim. P. 4.02 subd. 5(1) comment.

The prompt appearance requirement has long existed in statutes and court rules. *See, e.g.,* Minn.Stat. § 629.14 (2000) (requiring that arrested person be taken before a judge "with all practicable speed").[2] In 1943, the United States Supreme Court first explained the importance of such rules:

> For this procedural requirement checks resort to those reprehensible practices known as the "third degree" which, though universally rejected as indefensible, still find their way into use. It aims to avoid all the evil implications of secret interrogation of persons accused of crime. It reflects not a sentimental but a sturdy view of law enforcement.

*McNabb v. United States,* 318 U.S. 332, 344, 63 S.Ct. 608, 87 L.Ed. 819 (1943); *see also Mallory v. United States,* 354 U.S. 449, 455, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) (holding delay in arraignment "must not be of a nature to give opportunity for the extraction of a confession"). In both *McNabb* and *Mallory,* the Court applied the exclusionary rule in suppressing confessions obtained in violation of the federal rule requiring that defendants be promptly taken before a judicial officer. *McNabb,* 318 U.S. at 341–42, 63 S.Ct. 608; *Mallory,*

354 U.S. at 455–56, 77 S.Ct. 1356; *see also* Fed.R.Crim.P. 5(a) (requiring a person arrested without a warrant to be brought before a magistrate "without unnecessary delay"). While the Court was concerned that the lengthy detention before being brought to court could result in a coerced confession, it nonetheless held that exclusion of such statements from evidence was not constitutionally required. *McNabb,* 318 U.S. at 340, 63 S.Ct. 608. Thus, the state courts were not bound by the McNabb/*Mallory* exclusionary rule. *Gallegos v. Nebraska,* 342 U.S. 55, 63–64, 72 S.Ct. 141, 96 L.Ed. 86 (1951).[3]

■ Our court has also recognized the importance of a prompt appearance rule. In *State v. Wiberg,* 296 N.W.2d 388, 392 (Minn.1980), we noted that the rationale of such a rule is to:

> [A]void the coercive nature of custodial surroundings by preventing secret interrogation and the resultant pressure to confess. In addition, prompt arraignment insures that an arrested person will be fully advised of his rights by a judicial officer soon after his arrest.

We also note that arraignment is typically the point at which financial eligibility for an appointed attorney is determined and

2. The prompt appearance requirement should be distinguished from the separate requirement that there be a prompt determination of probable cause to hold the defendant. *See Gerstein v. Pugh,* 420 U.S. 103, 126, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); Minn. R.Crim. P. 4.03 (requiring that probable cause determination must be made within 48 hours of arrest). Waddell does not claim error with respect to a probable cause determination, as it was made by a judge on Friday, December 8, 2000, at 3:21 p.m., well within the 48–hour requirement.

3. Several courts and commentators have questioned the continued vitality of the McNabb/Mallory rule requiring suppression of statements made after violation of the prompt appearance rule, on the basis that

since *McNabb* and *Mallory* the Supreme Court has enacted other safeguards against coerced confessions, such as *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See People v. Cipriano,* 431 Mich. 315, 429 N.W.2d 781 (1988) (stating that concerns that troubled the *McNabb* court were addressed and remedied by subsequent changes in constitutional doctrines); *see also* Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 6.3 (2nd ed.1999); *O'Neal v. United States,* 411 F.2d 131, 136 (5th Cir. 1969). We note that in Minnesota, criminal defendants are further protected against coerced confessions by the recording requirement for custodial interrogations that we adopted in *State v. Scales,* 518 N.W.2d 587 (Minn.1994).

counsel is appointed. Minn. R.Crim. P. 13.02 (providing for appointment of counsel at arraignment), 5.01(b) (requiring judge to advise defendant at arraignment of right to counsel at all subsequent proceedings, including police line-ups and interrogations), 5.02(1–2) (notifying defendant of right to counsel and appointing public defender if necessary). Thus, the prompt appearance rule also serves the purpose of ensuring that a defendant receives counsel at the important post-arrest stages of a criminal prosecution.

■■■ While the importance of a prompt appearance rule has been recognized by the court, we do not automatically exclude confessions made after violation of the rule. *Wiberg*, 296 N.W.2d at 393. Rather, the courts evaluate whether and to what extent a delay in bringing the defendant before a judicial officer was prejudicial. *See, e.g., Meyer v. State*, 316 N.W.2d 545, 546–47 (Minn.1982); *State v. Nelson*, 285 Minn. 304, 310, 173 N.W.2d 349, 353 (1969). Nonetheless, as we stated in *Wiberg*, our decision not to automatically exclude such statements should in no way be considered approval of the practice, and delay in arraignment should "weigh heavily" in any decision whether to suppress evidence. 296 N.W.2d at 393.

■■■ In deciding whether evidence should be suppressed, we apply the nonexclusive factors developed in *Wiberg*, including: 1) the reliability of the evidence; 2) whether the delay was intentional; 3) whether the delay compounded the effects of other police misconduct; and 4) the length of the delay. 296 N.W.2d at 393.[4]

With the important interests reflected in the prompt appearance rule and the *Wi-*

*berg* factors in mind, we turn to the facts of this case. It is undisputed that Waddell was held for approximately 86 hours prior to confessing, and 109 hours before being presented to a judge or judicial officer. Prior to the expiration of the 36–hour period, the state sought and obtained an extension of the time for Waddell's first appearance by asserting that additional time was necessary to reformat a surveillance videotape, take physical measurements at the scene, further analyze physical evidence at the scene, obtain and execute search warrants, and interview witnesses without interference. At the same time, less than 24 hours after the arrest and well within the 36–hour period, the state went before a judge with sufficient information to obtain a judicial determination of probable cause to detain.

We conclude that the state has provided insufficient reasons as to why Waddell could not have been presented within 36 hours following his arrest. Reformatting the convenience store videotape and taking measurements at the crime scene were not necessary to charging Waddell. The need to analyze physical evidence such as fingerprints, was similarly not necessary to charge Waddell. The state also claimed that it needed to execute search warrants and conduct witness interviews without interference. However, one other suspect was in custody, there were eyewitnesses who would be able to place the car and perhaps Waddell at the crime scene, and there was no indication that witnesses would be threatened or the execution of search warrants hampered in some fashion after arraignment. Particularly in light of the fact that probable cause to detain

---

4. In *Wiberg*, the defendant was arrested midweek and was confined for 35 hours prior to arraignment. Just before arraignment, she was questioned and admitted ownership of a handbag containing a stolen handgun. 296 N.W.2d at 392. In the absence of any explanation for the delay in arraignment, we concluded that the delay—a delay of less than 36 hours—was unnecessary and therefore violated Rule 4.02. 296 N.W.2d at 392.

Waddell was established on the facts known by Friday, December 8, we must conclude that the reasons given to the district court in support of the extension of time were insufficient. Therefore, the failure to bring Waddell before the court within 36 hours violated Rule 4.02, subd. 5.

Although separate from our analysis above, we are troubled by the fact that even though the state obtained an extension, Waddell was not brought before a judge or judicial officer after obtaining his confession on Monday, December 11. *Wiberg* makes clear that "although the time factor is a key element in whether a delay is unnecessary, it is also important for a court to consider how the time was used." 296 N.W.2d at 392. Here, the burden remained upon the state to bring Waddell before a judge or judicial officer as soon as possible, regardless of the extension obtained.

■ We turn now to whether Waddell's confession, obtained well after 36 hours, should have been suppressed. In making this determination, we apply the *Wiberg* factors, keeping in mind the purposes of the prompt appearance rule. Here, as in *Wiberg*, Waddell was given a full *Miranda* warning and waived his right to remain silent before making his statement. Indeed, Waddell initiated the fourth interview with police, which was recorded and during which he confessed. The voluntary nature of the interrogation suggests the statement is reliable, meeting the first *Wiberg* factor.

The second *Wiberg* factor is whether the delay was intentional. 296 N.W.2d at 393. While the state consciously chose not to bring Waddell for arraignment within 36 hours, the state cannot be considered to have flouted the prompt appearance rule where the matter of the extension for arraignment was presented to the court. Thus, the delay was not intentional in the

sense meant by the second *Wiberg* factor. Third, given our holding that the stop of the vehicle was not illegal, the delay did not compound any previous police misconduct. Therefore, the third *Wiberg* factor is not met.

With respect to the fourth *Wiberg* factor, the length of the delay is indeed troubling. Waddell was held a full 50 hours past the outer limits of the time in which he should have been presented to a judge or judicial officer for arraignment. Nonetheless, we are cognizant of the fact that Waddell was repeatedly advised of his rights to remain silent and to an attorney, yet initiated the interrogation at issue. Thus, on these facts, the apparent lack of a coerced confession that formed the genesis of the prompt appearance and *McNabb/Mallory* rules ameliorates some of our concern. We remain aware, however, that a defendant subject to extended detention without appearance before a judge or judicial officer may come to believe that the only way to get an attorney appointed or to move his case along is to confess. We therefore emphasize the importance of prompt appearance, not only to guard against coerced confessions but to ensure the prompt appointment of counsel. While the facts presented take us to the outside edges of Minn. R.Crim. P. 4.02 subd. 5(1), we cannot conclude on the record before us that the failure to promptly arraign Waddell warrants exclusion of his confession. Thus, we hold that the confession was properly admitted and Waddell's conviction is affirmed.

Affirmed.