GLICKSTEIN, Judge.
The trial court signed a one sentence order, granting the defendant’s motion to suppress evidence obtained in a warrant-less vehicular search. We reverse.
The evidence relevant to the issue is solely contained in a law enforcement officer’s deposition, which is therefore the basis for the trial court’s decision. The deposition was that of James Hughes, an officer with the Coral Springs Police Department. The incident in question took place on Thursday, July 25, 1985, at approximately 7:30 p.m., when it was still daylight, and fairly bright. Officer Hughes, accompanied by a dispatcher, drove down a dirt road which led through a field, and saw a car parked on the dirt road. We know that which the deposed officer saw would not be enough to justify the subsequent intrusion that occurred, as all he saw was the defendant driver pass something to a back seat passenger, who passed something to another passenger in the front seat. An officer’s bare suspicion, aroused by some indefinite movement by a vehicle's occu *23 pants, the nature of which movement the observer cannot articulate, is not a sufficient basis for a stop; for such movement does not raise the suspicion to the level of founded suspicion. See G.J.P. v. State, 469 So.2d 826, 827-28 (Fla. 2d DCA 1985), and cases cited therein. But in the instant case, what the officer himself observed was not by itself the basis for the stop.
The officer subsequently stopped his vehicle, approached the defendant’s vehicle, and asked the defendant to shut off the engine, as the defendant had started the vehicle and had started to back up. The officer then asked to see some identification, as the department had problems with drug transactions “taking place back there.”
The deposition establishes what the officer had heard before he made the stop:
Q You could not tell if they were doing a drug transaction, could you?
A No. What brought my attention to the possibility that this was a drug transaction when we first pulled around the corner is the dispatcher sitting to my right, she said, “Was he snorting something?” I said, “I couldn’t tell,” and she said, “I saw a straw,” so that’s why we approached at that point.
Q Did she say she saw a straw or something that could have been a straw? It’s hard to tell from 35 feet away.
A She said it looked like a straw to her. She said, “It looked like he was snorting something.” I didn’t see that. She said she saw him snorting something. That’s why I approached the car the way I did.
(Emphasis added.)[1]
The dispatcher was a new, civilian dispatcher who was riding to witness “what was out on the street.” We do not know anything of her training outside of Coral Springs but know she had none relevant to this case with the department involved here.
*24 We fully realize what the requirements of a warrantless search are. Nevertheless, we cannot bring ourselves to believe that the officer in the instant case could ignore' what he heard the dispatcher say; or that we can ignore what he heard in determining if there was reasonable suspicion to make the stop.
In our view, the trial court erred in suppressing the evidence. Factually, this case is distinguishable from Carter v. State, 454 So.2d 739 (Fla. 2nd DCA 1984) (Officers observing occupants of legally parked vehicle bend down, and individual officer’s seeing driver place rolled up bill in pocket as officer approached car did not constitute founded suspicion authorizing a lawful investigatory stop and detention under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). In contrast, someone’s snorting through a straw, seen by the dispatcher who was riding with the officer, and communicated by her to the officer, who had previously seen something apparently being passed among the occupants, constitutes an articulate basis for founded suspicion in an experienced law enforcement officer's mind.
HERSEY, C.J., and LETTS, J., concur.

. It is not relevant to the issue here; but in order that the reader will understand what subsequently occurred, we quote the following from the deposition:
Q. You went around to the other side of the car and the other two people got out of the car?
A. I asked them to step out of the car and they did, and I asked for identification.
Q. What happened?
A. As they were getting their identification out, I noticed a brown bag that was laying on the passenger’s floorboard of the car, and sticking out was about, maybe a quarter of an inch of a mirror sticking out of the end of the bag, and the end of a straw.
Q. Did you notice anything unusual about this mirror or straw? Was there a white powder on it?
A. There was a little white powder on the edge of the mirror and also a homemade pipe for smoking what happened to be marijuana.
Q. Where was that?
A. Also on the floorboard of the car.
Q. On the passenger’s side?
A. Right.
Q. Now, you said you had to let these people get out before you could even see this; is that right?
A. Right. As they stepped out of the car it was laying on the floorboard.
Q. When you asked Jeffrey Huntley to get out of the car you were on the driver’s side?
A. Right.
Q. Were you able to see these things?
A. I was able to see the pipe.
Q. From the driver’s side?
A. Right, because it was — what it is, it’s a piece of plumber pipe, chrome shiny pipe they use on the bottom of a basin. I could see that, and also it had the little knob and piece that came up, I could see that,
Q. Did it have a bowl on it?
A. That’s what I am talking about. The piece that came up was the bowl.
Q. And you saw that all from—
A. I could see that from standing up looking into the car.
Q. From Mr. Huntley’s side or from the other side?
A. From Mr. Huntley’s side.
Q. Before or after he got out of the car?
A. Before.
Q. But this was after you had told him to turn off the key to the car and stop and told him to get out?
A. Uh-huh (positive)
******
Q. What happened then?
A. I asked them to step to the rear. I requests ed a back-up unit at that point because I knew I had at least the pipe, which was paraphernalia, and the mirror and the straw. On the console I also noticed two razor blades laying there.
Q. You didn’t notice them at first?
A. No, because they were dark in color and the console was black, if I remember right.
*24 I asked them to step to the rear. As I stepped to the rear, I was talking to them and I then walked back up to the car, picked up the pipe and the pouch, the razor blades, and I walked — as I picked up the pouch, that’s when I noticed the cocaine laying on the floor.
Q. Where was the cocaine?
A. Under the pouch.