**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                    No. 96-4208

ERIC BOLTON,
Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
John T. Copenhaver, Jr., District Judge.
(CR-95-89)

Argued: July 11, 1997

Decided: August 26, 1997

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Hunt Lee Charach, Federal Public Defender, Charleston,
West Virginia, for Appellant. Monica Kaminski Schwartz, Assistant
United States Attorney, Charleston, West Virginia, for Appellee. **ON
BRIEF:** C. Cooper Fulton, Assistant Federal Public Defender,
Charleston, West Virginia, for Appellant. Rebecca A. Betts, United
States Attorney, Charleston, West Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

PER CURIAM:

Eric Bolton pled guilty, pursuant to a plea agreement, to possession with intent to distribute 50 grams or more of cocaine base in violation of 21 U.S.C. § 841(a)(1). During sentencing, the district court imposed a two-level enhancement pursuant to U.S.S.G.§ 2D1.1(b)(1) for possession of a firearm and sentenced Bolton to 168 months imprisonment. Under his plea agreement, Bolton reserved his right to appeal the district court's ruling on his earlier motion to suppress evidence seized from Bolton's green duffel bag prior to his arrest for cocaine possession. See Fed. R. Crim. P. 11(a)(2).

On appeal, Bolton now challenges (1) the district court's ruling refusing to suppress evidence, and (2) his enhancement for possession of a firearm. We affirm.

I

Eric Bolton's 16-year-old girlfriend, Sheena White, was shot in her mother's home in an apparent suicide. Bolton called 911, and the police and paramedics came to the scene. Police found Sheena White lying on the floor with Bolton standing over her holding their one-year-old baby. A .380 caliber Browning semi-automatic handgun was found lying on the floor nearby with the safety engaged. An ammunition cartridge associated with the weapon was recovered from the scene, and a shell casing was recovered from the kitchen floor.

Police took Bolton and his son into a back bedroom so that paramedics could work on Sheena White and also because Bolton was upset. The officer who moved Bolton to the back room testified that Bolton would not have been allowed to leave the back room or the apartment at that time.

2

While in the bedroom, Bolton consented, after having been advised of <u>Miranda</u> rights, to provide police with a gunshot residue specimen from his face and hand. Police then asked Bolton whether he would go to the police station for an interview. Bolton agreed "willingly and voluntarily." He was not placed under arrest and was free to leave if he had chosen to do so. As Bolton was leaving to go with the police to the station, he entered another bedroom and reached to pick up a green duffel bag which he said he needed because he would not be coming back. Police told Bolton that the bag would have to stay but that Bolton could retrieve it later. As Bolton was leaving the house, as he was traveling to the station, and at the station, he repeatedly asked for the baby's inhaler. Police told him that other officers would look for it and bring it to the station. Bolton repeated the request -- with some urgency -- to be allowed to retrieve the inhaler, and at the station, Detective Hammons told Bolton that other police would look for the inhaler. Bolton responded, "Okay."

At the police station, Bolton was again given <u>Miranda</u> warnings, and he acknowledged orally and in writing that he was not under arrest and was free to leave at any time. Bolton admitted that the green duffel bag was his. Because Bolton's clothes were to be tested, as they had blood on them, police informed Bolton that they would retrieve replacement clothing for him, to which Bolton did not object. At no time did Bolton place any limits on the police's search for his replacement clothes and the baby's inhaler.

Detective Mark Carlson went back to the house where the shooting occurred to look for the baby's inhaler and to find a shirt and pair of pants for Bolton. Carlson instructed Detectives Ingram and Walker to find the inhaler and some clothes. Ingram found some medication, but no inhaler, so Carlson removed a baby bag and the green duffel bag from the bedroom to the living room to look through them. Carlson first looked in the green duffel bag for clothing for Bolton. Men's shirts were visible on top, and as Detective Carlson removed the shirts, he saw two bundles of money -- the smaller of which was one-quarter inch thick -- and felt a bag with chunks, soft in places, which he perceived to be crack cocaine because it was in the presence of a large amount of cash. The bag in fact did contain crack cocaine which, with the cash, was seized. A few minutes later, Detective Carlson was informed that Sheena White's mother had been contacted and

3

that she reported that the baby did not have asthma and had no need for an inhaler.

In ruling on Bolton's motion to suppress the crack cocaine, the cash, and statements he made about the inhaler, the district court found facts, as stated above, and concluded:

> The defendant's repeated requests for the inhaler for the baby, even to the point of asking that he be permitted to return to the apartment to find it, coupled with the urgency with which his requests were made and his response that it was okay when told that the officers would search for it and find it, invited the officers to make a thorough and exhaustive search of the premises and the articles within it in order to assure that the baby would be properly cared for. After the extensive search for the inhaler made by Officer Ingram, Detective Carlson, who had been assigned the responsibility of finding the inhaler and the clothing for the defendant, searched both of the bags through which the other officers had not looked.

> Although Detective Carlson did not expect to find the inhaler in the green duffel bag, it was objectively reasonable to search the bag for the inhaler inasmuch as it had not been found elsewhere. In what appears to have been a ruse by the defendant, the officers were effectively invited by him to make the search that led to the discovery of the money and the crack cocaine found in his bag. Moreover, inasmuch as the green duffel bag was to be returned to him at the stationhouse, it was reasonable to search the bag for security reasons and, in addition, to obtain an inventory of its contents while in the possession of the officers.

Accordingly, the court entered an order denying the motion to suppress.

Bolton contends that when he was removed from the scene to the back bedroom and later taken to the police station, he was arrested without probable cause and that his statements about an inhaler were the direct result of that arrest. In turn, he argues, the discovery of the

4

crack cocaine and cash were the result of his statements about the inhaler. He argues that he was arrested for Fourth Amendment purposes as soon as he was taken to the back bedroom while paramedics were working on Sheena White.

In moving Bolton to the back bedroom, however, there is no evidence he was ever physically restrained or told that he could not leave, even though an officer indicated later that he would not have allowed Bolton to leave at that point in time. A few minutes following the police's arrival, the paramedics were attempting to revive Sheena White and to conduct an investigation for a potential homicide. They therefore needed to exclude everyone from the scene and to secure it. While Bolton was in the bedroom, police did request from him residue specimens from his face and hand, which he voluntarily provided. The actions of the police, up to this point, did not constitute an unreasonable search and seizure in violation of the Fourth Amendment. The actions of police officers fell well within their rights to protect and secure a crime scene. While the death of Sheena White appeared at first blush to be a suicide, the gun near the scene had its safety engaged, and a shell casing was found in the kitchen. Bolton was the only other person in the house, except for a one-year-old baby, and therefore the police were reasonably entitled to allay their articulable suspicion by detaining him temporarily. See Terry v. Ohio, 392 U.S. 1 (1968).

Once this momentary detention was completed, the police officers asked Bolton to go to the police station for questioning. The district court found that Bolton did so voluntarily. Moreover, once at the police station, Bolton was advised orally and in writing that he was not under arrest and was free to go, and he signed the written form. Notwithstanding this advice, Bolton chose to remain and answer questions, and he authorized police officers to continue their search for the inhaler and for a change of clothing. In these circumstances, we do not find any error in the district court's decision to deny the motion to suppress.

II

After the district court refused to suppress the currency, crack cocaine, and statements, Bolton entered a guilty plea. In connection

5

with sentencing, the probation officer recommended a two-level enhancement for possession of a firearm in connection with the offense, pursuant to U.S.S.G. § 2D1.1(b)(1). The district court agreed with the recommendation and sentenced Bolton to 168 months imprisonment.

At sentencing, the court admitted into evidence two pistols, the .380 caliber pistol which had killed Sheena White, and a Ruger 9mm semi-automatic pistol that had been found by Sheena White's mother and brother when they were cleaning the house several days after Sheena's death. Sheena White's brother testified that he found the 9mm pistol underneath the baby's dresser in the same room where Bolton had left his green duffel bag. Sheena White's mother testified that she never saw Sheena with guns in the house, even though her mother periodically looked through Sheena's room. Sheena's mother also testified that she never saw a gun in the room of her other son, Angelo, although she had later heard that Angelo had once fired a gun in her house.

The government proffered testimony from various witnesses who would testify that prior to March 1995, they saw Bolton carrying a 9mm pistol and a .380 caliber pistol in connection with drug dealing. The government also proffered testimony that Angelo White would testify that he had seen Bolton with five different guns in the course of drug transactions. Bolton himself, however, testified that the 9mm pistol in evidence was Angelo's gun and that he had not seen it since Angelo had been put in prison some two months before Sheena White's death.

The court found by a preponderance of the evidence the following facts relating to Bolton's possession of a gun:

> The court further finds that the defendant was in posses-
> sion of the weapon that was found in Lillian White's apart-
> ment where Sheena White lived, being the Browning .380
> caliber semiautomatic pistol with which Sheena was shot to
> death and the Ruger pistol found about eight days later hid-
> den under the baby dresser. Neither Ms. White nor her
> daughter, Sheena, possessed such weapons. Sheena, how-
> ever, being the defendant's girlfriend and the mother of his

6

child, was aware of the defendant's drug trafficking activities and, the court finds, would have been aware of the defendant carrying firearms in connection with that activity while carrying in and out of the apartment from time to time the green duffel bag, in which bag was found the crack cocaine and 14,000 dollars in cash on May 22, 1995, the day of the shooting.

The 9 millimeter pistol appears to have been owned by Angelo White who, as earlier noted, stated that he did not believe that weapon to be owned by the defendant. The defendant, however, knew that Angelo White owned the 9 millimeter weapon and testified that he had seen Angelo White breaking the weapon down while in Lillian White's apartment. In addition, the box for housing the Ruger was, after the shooting, found in the apartment containing a picture of Angelo White.

Angelo White, after his arrest in March of 1995, asked Sheena to have the defendant to get the gun out of the house, which Sheena, in turn, told the defendant about. Once Angelo White was arrested, that weapon was also available to the defendant for the purpose of protecting the defendant's drug trafficking activities. Both the Browning .380 and the Ruger 9 millimeter were in the defendant's possession in connection with the drug offense of conviction in this case.

The district court heard all of the evidence and weighed the credibility of both Bolton -- who claimed to never have possessed any weapons -- and of the Whites -- who felt that Bolton was a murderer. There was no dispute that the .380 was there on the day of Sheena's shooting. There was also evidence that Sheena never owned or had a gun in her house. And there was ample evidence that people had seen Bolton with a .380 in the course of his drug dealing activities. The district court could reasonably conclude that Bolton possessed the .380 found near Sheena's body, and we cannot conclude that its factual findings were clearly erroneous.

AFFIRMED